Opinion.

---

· **Richmond.**

DAVENPORT v. DAVENPORT.

March 14, 1907.

1. DIVORCE—*Cruelty—Desertion—Case in Judgment.*—The evidence in this cause shows that the husband withheld from his wife, who was faithful, kind and considerate, the affection which was due her, used abusive language to her, seized her person with violence, and threatened her with greater violence. This, in law and in morals, is cruelty of a gross and brutal character. The evidence further shows that his treatment was such that she could not live with him in safety, and in peace and concord, but was compelled, through no fault of hers, to seek shelter elsewhere, after he had removed his own sleeping apartments to another house in the yard. Such conduct on the part of the husband amounts to abandonment as fully and completely as if he himself had left the house with intent never to return to it. Under such circumstances the wife is entitled to a divorce *a vinculo*, and to a decree for alimony and reasonable fees to her counsel. The amount of the alimony, however, can be best fixed by the trial court, and the cause will be remanded to that court with directions to make its own decree for such alimony and counsel fees as shall seem just and right.

Appeal from a decree in chancery of the Circuit Court of Campbell county. Decree for the defendant. Complainant appeals.

*Reversed.*

The opinion states the case.

*James H. Guthrie,* for the appellant.

*W. M. Murrell,* for the appellee.

CARDWELL, J., delivered the opinion of the Court.

In March, 1903, appellant, Nannie T. Davenport, filed her bill against appellee, F. E. Davenport, for a divorce *a vinculo matrimonii,* on the grounds of cruelty, abandonment and desertion, and the cause was regularly matured and set for hearing at rules. Appellee made no appearance, and at the November term, 1903, of the court the cause was heard on the bill and proof adduced by appellant, the divorce granted and alimony allowed. To this decree appellee, in January, 1904, was permitted to file a bill of review, upon the hearing of which, without notice to appellant, the decree of the November term, 1903, was set aside and the cause reinstated on the docket, and thereafter the two causes were heard together. Appellant's bill was by leave of court amended; the appellee demurred to and answered the amended bill, and asked that his answer be treated as a cross-bill and that appellant be required to answer; the cross-bill praying a divorce *a vinculo* from appellant on the ground of desertion for over three years.

Appellant moved to reverse and annul the decrees entered on the bill of review, which motion was overruled, and on the 18th of May, 1904, the decree under review here was rendered, setting aside the decree entered at the November term, 1903, in the first cause, and granting to appellee a divorce from appellant *a vinculo,* in accordance with the prayer of his cross-bill.

In the view we take of the case, it is immaterial whether or not the Circuit Court rightly entertained the bill of review, as practically the same result must follow whether the decision of that question be the one way or the other.

Upon the refusal of the court to dismiss the bill of review, or to set aside the decrees entered thereon, appellant, as stated, amended her original bill, and by the amendment met fully the objection made that the statement of the case in her original bill was not a sufficient statement to give the court jurisdiction of the cause. The demurrer of appellee to the amended bill was overruled, and appellant took again the deposition read in

support of her original bill, upon which the decree of the November term, 1903, was made, and other depositions in her behalf, as well as on behalf of appellee, were duly taken and considered by the court at the final hearing of the cause. So that the parties were before the court without question as to its jurisdiction to hear and determine the issues made by the pleadings, and those issues were determined by the decree here complained of, viz: whether or not appellant was entitled to the relief granted her in the decree entered at the November term, 1903; and the court not only held that she was not entitled to that relief, but that appellee was entitled to the relief prayed in his cross-bill, and decreed accordingly.

In this view of the merits of the case we are unable to concur. It appears that these parties intermarried in 1886, and lived, until their separation in November, 1899, upon a farm of 60 or 70 acres situated in Campbell county, which was bought after the marriage and paid for by their joint efforts; that two children were born of the marriage, but one of them only, the boy, was surviving when this litigation was begun, then of the age of thirteen years; and that the parties, from their marriage, lived together comparatively harmoniously until a short while before their separation, when discord and dissension came, growing mainly, if not altogether, out of appellee's disagreement with appellant as to her religious views and preference for the Baptist Church—he about that time becoming infatuated with the Seventh Day Adventists. It further appears that in November, 1899, appellee occupied and slept in one part of the house, and required appellant, with her child, to occupy a different part of the home, their home consisting of two small houses situated a few feet apart, one a frame and the other a log house. Appellee claims that he slept in a different room on the lower floor of the log house, while appellant occupied the upper room in the frame house, because of the interruption of his rest at night by the noise caused by the entertainment by the lady teacher boarding in the house, in

the room below the room occupied by appellant. On the other hand, the claim of appellant is that appellee separated from her after maltreating her for some time previous, and after telling her repeatedly that he would not do anything further for her, and ordered her out, saying he would throw her out if she didn't go. She testified that he had been cruel in his treatment of her for some time prior, not only using profane and abusive language, but calling her vile names, refusing to do anything for the support of herself or child, telling her repeatedly to "take every damn thing and get out," and that finally he occupied a different room, having thereafter nothing to do with her; that she did not leave at that time, as the presence of the teacher in the house was some protection, and the teacher could get no other place in the neighborhood at which to board; "also to keep my child in school"; but the teacher leaving at the end of her school term in April, left appellant alone with her little boy, and being then unprotected, not knowing to what extent appellee might go in his cruel treatment of her, she with his assent took what there was in the house belonging to her and a cooking stove which he gave her and moved to her father's home. She further testifies, concerning the circumstances leading up to appellee's abandonment and desertion of her, that when she wanted to join the Baptist Church he said "he did not care what the devil I joined, but he hoped I would get my head hung under a root and drown"; that "after baptism he said he would never turn his hand to do anything for me again, me nor the damn preacher, nor none of the damn set, meaning the Church. And he came home three different evenings and told me to get out, that he intended to live to himself the balance of his life. He repeated it the third time before I went out." When asked if after she had, by his orders, occupied another part of the house from that occupied by appellee, he said anything more to her, she answered: "Yes, on Friday before Christmas, after the teacher had left for her holiday, he came in about dark and cursed me and abused me,

and threatened to take an axe and split everything to pieces in my room. Took hold of my arm and shook me until my arm was bruised black. He said that if I did not get a glass or mirror that belonged to him, he would drag me out and kill me."

"Q. Please state that if at any time you were put in fear of him or in danger of personal danger, other than the times you have mentioned?" "A. Yes, I was afraid of him from that time on. I had no protection. He had threatened to kill me, and I kept my doors locked from that time as long as I stayed there night and day."

The son, of the age of about fifteen years when he gave his deposition in this cause, of more than ordinary intelligence for one of his age, as shown by the responsive and intelligent answers he made to the questions propounded to him, not only substantially but in almost every detail corroborates the statements made by his mother in her bill and in her deposition. He testifies that appellee cursed and abused his mother in his presence a number of times, and a number of times called her a damn bitch. This witness was in the best position of all who testified either for or against appellant to know and appreciate the truth of her statements as to the treatment she received at the hands of appellee. Those statements are also borne out by other facts and circumstances proven in the record. J. B. Snow, a witness for appellee, proves that the separation of appellee from appellant occurred in November, 1899, by his moving into, or continuing from that time to occupy, a room on the ground floor of the log house, while appellant occupied an upper room in the other house.

To overcome the evidence in behalf of appellant appellee has only his own deposition given in the case as to the charges of cruelty and the desertion of appellant, and that of others as to "his general reputation as an industrious, sober and peaceful man in the neighborhood," or as a "hard-working, honest man." None of these witnesses lived nearer to appellee than one or two

miles, the most of them much farther, and as to what he did towards supporting appellant and child, or as to his treatment of her causing her to have to leave his home, none of them claimed to know, except the lady teacher, of whom mention has been made and whose deposition will be considered later. Appellee endeavored, on the witness stand, to disclaim the ill treatment of appellant charged against him, and sought to make it appear that she had abandoned and deserted him without cause, yet on cross-examination he was forced to admit that he separated from her in November, 1899, making his lodging-place in another part of the house from her, thereby ceasing to cohabit with her as his wife; that in April following the separation he had notice on the day preceding that on which appellant moved away that she had gone to get a Mr. Snow to help her move away the next day, and that he never at any time after the separation in November, 1899, made any effort to induce her to live with him again, or to in any way effect a reconciliation. He denied that he knew of appellant's intention to be baptized, or when it was to take place; yet when asked as to the charges she made of his use of profane language in her presence, he answered: "I told her once when she told me she was going to join the Baptist Church she could take Street (the pastor) and go to the old boy with him. I remember saying that." When asked as to having cursed and abused appellant, he makes the following answers: "I do not dispute having some quarrels, but I do deny having treated her as she claims she was treated." "I never called her any worse names than she called me; if they are too vile to be mentioned here, so are the ones she called me, I guess." When asked if he had not on a great many occasions called her "a damn bitch," he answered: "I am sorry that I did mention it once, through the heat of passion, she made me so mad; that is the only thing I was ever sorry for I ever did." He admits that he gave himself no concern about the suit against him for divorce until he learned that the decree granting the divorce also allowed ap-

pellant alimony, counsel's fees, etc.  His *mala fides,* disclosed
by the record, is accentuated by his strenuous efforts to pre-
vent appellant from obtaining any part of his property for her
support.  To meet and overcome the proof that appellant had
been not only a faithful, kind and considerate wife, aiding by
her efforts not only in providing for the sustenance of the fam-
ily, but had been helpful to a considerable degree in making
and saving the money with which the home was paid for, he
claimed and throughout sought to prove that he paid the entire
purchase money for the home, except $50.00 given by his
brother for that purpose, with the wages he earned for his labor;
yet no sooner had he been permitted to file his bill of review in
this cause and had gotten the decree entered therein at the No-
vember term, 1903, allowing appellant $500 as alimony and a
fee to her counsel, etc., set aside and annulled, as he supposed,
he executed and acknowledged in the clerk's office of Campbell
county a deed of trust conveying his home, the only property he
owned, to a trustee to secure the sum of $600 "borrowed by the
party of the first part from the party of the third part (his
mother) from time to time to pay for the lands hereby con-
veyed, together with the accrued interest thereon."

There is not one word of evidence in this record, except from
the mouth of appellee himself, tending to prove that appellant
was not to him at all times and under all circumstances, to the
time that he abandoned her, a faithful, kind, considerate and
helpful wife.

The lady teacher, a Miss Rively, who boarded at the home of
the parties to this suit during the winter of 1898-'99, was pro-
fessedly a very warm and cordial friend of appellant, but when
asked to come and testify in her behalf she declined, saying she
"did not want to be in a divorce suit, and be picked and quizzed
by lawyers"; and when pressed by letter to come, she declined
in a letter considered insulting, saying that if forced to come she
would not tell what she knew, etc.; yet she afterwards appeared
and gave her deposition in behalf of appellee.  While this wit-

ness testifies that she did not see any cruel treatment or hear any improper statement by appellee or abuse of appellant by him; that she knew nothing of the separation or the cause of it; that she did not remember one word that passed between herself and appellant, or between herself and Mrs. Howell (appellant's mother), in certain conversations said to have taken place between the witness and these parties; still, upon her cross-examination, she proves that the separation took place in November, 1899; that there was cause for it; and that she learned of it at the time. She further proves that up to that time appellee took his place at the table as the head of the family, and that he then separated from the family; that witness decided to change her boardinghouse because of the separation, and because she did not wish to remain in a house of that kind where there was a family disturbance. She also admits that a conversation was had at the table about company disturbing appellee, and from her statements it is to be seen that she was offended at what he said. She testifies further to the effect that she saw very little of appellee previous to the separation and nothing of him afterwards. When her attention was called to her intimate and cordial relations with appellant when she lived with her, and up to the time when she was asked to testify for her, to her intercourse with appellant's mother and to conversations between her and appellant and appellant's mother, she says: "I have taken no interest in the people, it has passed out of my mind altogether." Notwithstanding her reluctance, it plainly appears from the statements of this witness that there was no cause on appellant's part for appellee separating from her, and that he and not appellant broke off matrimonial cohabitation.

The boy, Alex. Davenport, and Mrs. Howell, the mother of appellant, testify in rebuttal as to conversations of Miss Rively in which she spoke of the ill treatment of appellant by appellee; that she should leave appellee; and that it was not safe for her to remain with him, etc.

The careful examination that has been given the evidence in the record leads irresistibly to the conclusion that appellant is entitled to a divorce *a vinculo* from appellee, alimony and the payment of reasonable fees to her counsel.

When a husband withholds from his wife, who has been faithful, kind, considerate and diligent in the discharge of her duties to him, efficient and helpful in securing the means with which to pay for a home, however humble, that affectionate regard for her feelings due to her, adding to this wrong, abusive language, calling her vile names, seizing her person with violence and threatening her with greater violence, he is, in morals and in law, guilty of cruelty of a gross and brutal character. To so treat a wife as to render it impossible for her to live with her husband in safety and in that peace and concord evidenced in every home where both the husband and wife bear the one to the other that affectionate regard and considerations which their relations to each other demand, is on the part of the offending husband desertion and abandonment of the other as fully and completely as if he himself had left the home with intent never to return to it. In this twofold attitude stood appellee towards appellant when, from no fault of hers, she had to leave his home and take refuge for herself and child in the home of her parents; and his desertion and abandonment of her, beginning in November, 1899, continued for more than three years before the institution of this suit.

We are, therefore, of opinion to reverse and annul the decree appealed from, with costs to appellant, to dismiss the cross-bill of appellee, and to grant appellant a divorce from appellee *a vinculo matrimonii;* but as the Circuit Court is in a much better position to determine as to the alimony that should be decreed to appellant, and has entire control over the estate of appellee under sections 2261 and 2263 of the Code, the cause will be remanded to that court, with direction to make its own decree requiring appellee to pay to appellant such alimony and allowance for services of her counsel as to the court may seem

just and right; and if it be necessary, in order to render such decree effectual, the court should cause the trustee and the beneficiary in the trust deed executed by appellee during the pendency of this suit, purporting to secure to his mother, Lydia A. Davenport, the payment of the sum of $600, to be brought before the court in this cause, that the *bona fides* of that transaction may be inquired into and determined.

*Reversed.*